**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| ROBERT R. NORTON, | ) | |
| | ) | |
| Plaintiff, | ) | 3:13-cv-00169-RCJ-WGC |
| vs. | ) | |
| | ) | **Order** |
| PHC-ELKO, INC. a domestic corporation, | ) | |
| doing business as NORTHEASTERN | ) | |
| NEVADA REGIONAL HOSPITAL, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This case was brought by a private employee who alleges that he was terminated in violation of the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), and a contractual agreement between the parties. Before the Court is Defendant's Motion for Summary Judgment (ECF No. 34), Plaintiff's Opposition to that Motion (ECF No. 41), and Defendant's Reply to Plaintiff's Opposition (ECF No. 46). For the reasons that follow, Defendant's Motion is GRANTED.

**I.       BACKGROUND**

The disorganized nature of Plaintiff's Opposition created a difficulty in determining Plaintiff's factual contentions. Nevertheless, the Court finds the following facts to be undisputed by the parties. Plaintiff worked as the Dietary Director at Northeastern Nevada Regional

Hospital ("Defendant" or "the Hospital") for eleven years before being terminated. (Norton Dep. 10:22–11:1, 16:14–16, ECF No. 34-1 Ex. 1).  Plaintiff was approximately sixty years old at that time. (*Id.* at 18:18–19).  During Plaintiff's employment at the Hospital, he underwent a number of back surgeries (*Id.* at 9:3–15, 14:25–15:13).  These surgeries required him to take leave from work and caused him complications at work since they limited the amount of weight he could lift. (*Id.* at 7–14; Miller Dep. 43:9–15, ECF No. 41-5).  Plaintiff still continued to work to the best of his abilities. (Norton Dep. 17:8–17).  A few months prior to Plaintiff's termination that is the subject of this lawsuit, Plaintiff underwent surgery to repair a torn rotator cuff. (Miller Dep. 43:9–15.)  The surgery required Plaintiff's absence from the Hospital for an unstated amount of time and that he attend physical therapy, which he did at the Hospital. (Norton Dep. 63:11–15).

Directors, such as Plaintiff, were given authorization to access and make necessary adjustments on the Hospital's Kronos system, the program utilized by the Hospital to track employees' work time. (Trollope Decl. ¶¶ 9–10, ECF No. 34-3).  To "clock in" or "clock out" (known as a "punch"), an employee would swipe her identification badge at a Kronos station and the program would record the employee's name, the time, and the action. (*Id.* at 9).  A director might then make a subsequent adjustment, for example, to add a punch if an employee failed to swipe his or her badge, to indicate that an employee was using paid time off, or to input that an employee worked in a supervisory capacity for a shift. (*Id.* at 16).  Kronos tracked any changes made to an employee's time by recording the unique user identification assigned to authorized managers. (*Id.* at 10).

In early February 2012, Marco Sanchez ("Sanchez"), an employee in Plaintiff's department, reported to Angela Chaffin ("Chaffin"), the Hospital's Human Resources ("HR") Director, that he believed Plaintiff was altering Sanchez's punch times and causing his

2

1   paychecks to be consistently lower than he anticipated. (Chaffin Decl. ¶ 4, ECF No. 34-2).

2   Chaffin took this accusation to Grant Trollope ("Trollope"), the Hospital's Chief Financial

3   Officer. (*Id.* ¶¶ 5–7).  Chaffin and Trollope informed Gene Miller ("Miller"), the Chief

4   Executive Officer of the Hospital, about the allegations against Plaintiff and their intent to

5   investigate Sanchez's claim. (Trollope Decl. ¶¶ 6–7).  Plaintiff was then suspended without pay

6   pending the outcome of the investigation. (Norton Dep. 102:23–103:7).

7        Trollope ran an audit report in Kronos searching for Plaintiff's edits on time records of all

8   employees in Plaintiff's department for a three-year period. (Trollope Decl. ¶¶ 11–12).  The

9   result of the audit showed that Plaintiff and many other Hospital supervisors consistently made

10  adjustments to employees' time. (*Id.* ¶ 15).  According to Trollope, Plaintiff's changes caused

11  particular concern because they were not accompanied with the usual reasons for these types of

12  adjustments. (*Id.* ¶ 16).  Rather than just adding a punch that an employee had missed, Plaintiff

13  was modifying the time at which punches occurred, which Trollope believed was illegal and

14  violated Hospital policy. (*Id.* ¶¶ 15–16).  This was also inconsistent with the changes made by

15  other supervisors. (*Id.* ¶ 16).  Trollope thought this behavior manifested Plaintiff's desire to cut

16  labor costs in his department by reducing the overall time worked by employees. (*Id.* ¶¶ 15–16).

17       On February 22, 2012, Miller and Chaffin met with Plaintiff to discuss the findings of

18  Trollope's audit. (Norton Dep. 127:16–25).  Plaintiff acknowledged that he indeed routinely

19  adjusted employees' time and that the adjustments were necessary to correct the time records to

20  reflect the hours Plaintiff believed the employees actually worked based on his personal

21  observations and the shift assigned to the employee. (*Id.* at 130:3–15).  Miller and Chaffin

22  doubted whether Plaintiff's time changes were actually appropriate.  For instance, the Kronos

23  record showed adjustments made by Plaintiff when he was on leave of absence and could not

24

personally observe his employees. (Miller Decl. ¶ 10, ECF No. 34-4; Chaffin Decl. ¶ 19).  Miller shortly thereafter terminated Plaintiff, citing that the decision was based on the information gathered by Trollope and Plaintiff's acknowledgment that he routinely made changes to employee's recorded work time. (Miller Decl. ¶¶ 10–13).  The Hospital then paid $5,655.10 to the nine current Dietary Department employees whose times Plaintiff had adjusted, which accounted for more than 400 work hours. (Trollope Decl. ¶ 20; Chaffin Decl. ¶ 22; Miller Decl. ¶ 14).

After his termination, Plaintiff filed a charge against the Hospital with the Equal Employment Opportunity Commission ("EEOC") claiming he was fired because of his age and health condition. (Charge of Discrimination, ECF No. 34-1 Ex.16).  He alleged that the time adjustment issue was just a pretext that Defendant used to justify his termination. (*Id.*).  With the EEOC's approval, Plaintiff sued Defendant for discrimination based on his age and disability. (*See* Compl., ECF No. 1).  Defendant moves for summary judgment on all claims.

## II.    LEGAL STANDARD

A principal purpose of the summary judgment rule is to "isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  A court grants summary judgment only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In making this determination, the court "must draw all reasonable inferences supported by the evidence in favor of the non-moving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Rather,

only genuine issues of *material* facts are relevant to the summary judgment analysis.  A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.  "The moving party bears the initial burden of establishing the absence of a genuine issue of material fact." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).  The burden is met by demonstrating to the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.  This is done by citing to depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1)(A).  Once the initial burden is met, however, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial." *Fairbank*, 212 F.3d at 531.

Moreover, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.  "In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23.  This causes the moving party to be entitled to judgment as a matter of law because the nonmoving party failed to sufficiently show facts supportive of an essential element of the case for which she bears the burden of proof. *Id.* at 323.  Conversely, where reasonable minds could differ on the facts proffered in support of a claim, summary judgment should not be granted. *Petzak v. Nevada ex rel. Dep't of Corr.*, 579 F. Supp. 2d 1330, 1333 (D. Nev. 2008).  "Summary judgment is inappropriate if reasonable jurors . . . could return a verdict in the nonmoving party's favor." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

**III.     DISCUSSION**

Plaintiff alleges that Defendant violated the ADA and the ADEA by terminating him because of his age and health condition.  Plaintiff also alleges that Defendant and Plaintiff had an employment contract that Defendant breached when it terminated him without cause, which Plaintiff contends also violated the implied covenant of good faith and fair dealing.  The Court reviews each of these claims in turn.

**A.  ADA Claim**

The ADA prohibits discrimination by an employer against a qualified individual on the basis of disability in regard to the discharge of the employee, and it requires employers to make reasonable accommodations for the individual. 42 U.S.C. § 12112(a)–(b)(5)(A) (2012).  It further states that an individual may not be discriminated against in retaliation because he or she opposed any act or practice made unlawful by the ADA. 42 U.S.C. § 12203(a) (2012).  Plaintiff raises arguments under both of these sections.

**1.  Discrimination under the ADA**

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the Supreme Court set forth a burden-shifting analysis to be used in Title VII cases that has been subsequently adopted as the appropriate analysis when considering motions for summary judgment in the ADA context as well. *Brown v. City of Tucson*, 336 F.3d 1181, 1186–87 (9th Cir. 2003).  The first step under this framework requires the plaintiff to show a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802.  Once the plaintiff makes a prima facie showing, the burden of production then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.*  The burden of persuasion, however, remains at all times with the plaintiff. *Villiarimo*, 271 F.3d at 1062.  If the employer presents a legitimate and

nondiscriminatory reason for discharge, the burden then shifts back to the plaintiff to show that the reason given is a pretext offered by the employer to conceal the discriminatory purpose. *McDonnell Douglas*, 411 U.S. at 804. If the plaintiff is unable to show pretext, then the employer's motion for summary judgment on the ADA claim should be granted. *See Villiarimo*, 281 F.3d at 1063 (holding that plaintiff's Title VII claim failed because she was unable to show that employer's reason for termination was pretextual).

"[T]o establish a prima facie case of discrimination under the ADA, a plaintiff must show that she: (1) is disabled; (2) is qualified; and (3) suffered an adverse employment action because of her disability." *Snead v. Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1087 (9th Cir. 2001). Defendant does not challenge Plaintiff's prima facie case as to disability or qualification. (Def.'s Mot. Summ. J. 13, ECF No. 34). The third prong is where Defendant makes its stand. Specifically, Defendant argues that Plaintiff was terminated because he was improperly shaving time off his employees' clocked work time, which Miller asserts he honestly and in good faith believed violated federal law and Hospital policy. (*Id.* at 14). At all times, Defendant maintains that neither Plaintiff's disability nor his age were contemplated or discussed in reaching the decision to terminate. (Miller Decl. ¶ 12). Defendant's contention is that even if a prima facie case were proven here, Defendant meets its burden of articulating that the termination was legitimate and based on a nondiscriminatory reason. The Court agrees that Defendant's stated reason satisfies the test. *See Van Pelt v. Skolnik*, 897 F. Supp. 2d 1031, 1045 (D. Nev. 2012) (McKibben, J.) (recognizing the falsifying of logbooks and timesheets to be a legitimate nondiscriminatory reason for termination under *McDonnell Douglas*). Accordingly, the *McDonnell Douglas* analysis shifts the burden back to Plaintiff to demonstrate to the Court that this reason is mere pretext.

A plaintiff may show that an articulated nondiscriminatory reason for termination is pretextual either directly or indirectly. *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000).  "Direct evidence is evidence 'which, if believed, proves the fact of discriminatory animus without inference or presumption.'" *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005) (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)). "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Id.*  A plaintiff's direct evidence is sufficient to show pretext and overcome summary judgment when it persuades the court that a discriminatory reason more likely motived the employer than the alleged pretextual one. *Chuang*, 225 F.3d at 1124 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

Indirect or circumstantial evidence requires "an additional inferential step to demonstrate discrimination." *Coghlan*, 413 F.3d at 1095. This is done "by showing that the employer's proffered explanation for the adverse action is unworthy of credence." *Id.* (citing *Tex. Dep't of Cmty. Affairs*, 450 U.S. at 256).  Since direct evidence is so probative, "the plaintiff need offer 'very little'" to raise a genuine issue of material fact. *Id.* (citing *Godwin*, 150 F.3d at 1221).  On the other hand, when a plaintiff relies on indirect or circumstantial evidence, "that evidence must be specific and substantial to defeat the employer's motion for summary judgment." *Id.* (internal quotations omitted).

In this case, Plaintiff offers very little direct evidence of discrimination.  Plaintiff states that he went to speak with the Hospital's HR department once or twice because he felt he was being treated differently because of his disability, but he does not specify how he was being treated differently. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 7, ECF No. 41).  Plaintiff does identify an instance when Miller "wagged his finger" in Plaintiff's face and stated that "he wasn't sure if

or when he would fire" Plaintiff, but neither Plaintiff's deposition nor his Opposition state that this incident was related in some way to Plaintiff's disability. (*Id.* at 7). Plaintiff also asserts that HR frequently inquired about his retirement plans, but Plaintiff fails to provide specific examples of the frequency of the inquiries or the content thereof. (*Id.* at 3, 18). Finally, during the meeting with Miller in which Plaintiff was terminated, Plaintiff claims that Miller told him that the Hospital "did not want to have people like [him] around." (*Id.* at 3). Plaintiff does not explain whether this comment referred to people with Plaintiff's disability or whether it referred to supervisors who adjusted time records in the way Plaintiff had done. Miller's comment as presented by Plaintiff is not clearly discriminatory. *See Coghlan*, 413 F.3d at 1095 (stating that direct evidence usually consists of statements that are clearly discriminatory). After combing through the remainder of Plaintiff's Opposition, the Court could not find any other instance where Plaintiff offers direct evidence of Defendant's discrimination. Considering the direct evidence provided, the Court is not persuaded that a discriminatory reason more likely motivated Defendant's actions than the alleged improper time adjusting. *See Chuang*, 225 F.3d at 1124.

The Court then moves on to consider Plaintiff's circumstantial evidence of discrimination. Plaintiff first contends that adjusting time sheets was a common practice among supervisors at the Hospital. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 4–5). He made these types of adjustments during his entire tenure with the Hospital and was never criticized for doing so. (*Id.* at 5). Plaintiff believed that it was his duty to monitor the timecards in this way and edit them as needed. (*Id.*). Moreover, Plaintiff argues that after Sanchez's complaint, Plaintiff sought and received permission from Chaffin to make the exact types of changes to employees' recorded work time that Defendant claims was the reason for his termination. (*Id.*). While other supervisors were instructed not to adjust time punches in the future, Plaintiff was fired. (*Id.*).

Plaintiff urges that these facts together with his disability could lead a reasonable juror to find that Defendant's reason for termination was pretextual. (Pl.'s Opp'n to Def.'s Mot Summ. J. 18). In sum, Plaintiff's argument is that Defendant's articulated reason for termination is pretextual because other supervisors engaged in the same activity and were not fired, which means Plaintiff's termination was motivated by something other than his adjustment of time records.

An employer's more favorable treatment of similarly situated employees is probative of pretext. *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003). To be probative, the employees must be similarly situated in all material respects. *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006). "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct. *Id.* Indeed, the conduct must be of comparable seriousness. *U.S. EEOC v. Republic Servs. Inc.*, 640 F. Supp. 2d 1267, 1279 (D. Nev. 2009) (Ezra, J.) (citing *McDonnell Douglas*, 411 U.S. at 804). Plaintiff's Opposition specifically identifies only Korrie Hornbarger ("Hornbarger") as engaging in the same time sheet practices as Plaintiff. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 4). Hornbarger was only reprimanded for these practices while Plaintiff was terminated. (*Id.*). Plaintiff and Hornbarger were not similarly situated, however. Hornbarger was Plaintiff's subordinate that reported directly to Plaintiff. (Chaffin Decl. ¶ 13). She was not a director and did not have the same responsibilities as Plaintiff. (*Id.*). Since Hornbarger was following Plaintiff's orders when adjusting time records rather than acting in a supervisory capacity, it makes sense that the Hospital would discipline her differently than Plaintiff. The difference in position, responsibility, and overall culpability for time adjustments between Plaintiff and Hornbarger convinces the Court that the disparity in treatment does not bolster Plaintiff's pretext argument.

Plaintiff alternatively attempts to show that Miller had "problems" with other directors who also dealt with serious health problems. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 6).  Plaintiff offers names but does not explain exactly the individual's health issue or how the disability related to the problem experienced by each director.  It appears from the short paragraph in Plaintiff's Opposition that each person identified either retired or left of his or her own accord. (*Id.*).  To defeat a motion for summary judgment, the nonmovant must point the court to "non-speculative evidence of specific facts, not sweeping conclusory allegations." *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1074, 1061 (9th Cir. 2011) (citing *Mackie v. Rieser*, 296 F.3d 909, 915–16 (9th Cir. 2002); *Leer v. Murphy*, 844 F.2d 628, 634 (9th Cir. 1988)).  Thus, even if the Court aggregates these allegations against Miller with Plaintiff's argument that time adjusting was common practice, Plaintiff's factual support of his ADA claim is still lacking. *See Snead*, 237 F.3d at 1094 (holding that although the employee met her burden to prove the prima facie case, her evidence was insufficient to raise a genuine issue of material fact regarding the legitimacy of the employer's proffered nondiscriminatory reason for termination where it was wholly independent of employee's disability).

Most damaging of all to Plaintiff's pretext argument is the Hospital's actions after Plaintiff was terminated.  Defendant identified and calculated the amount of time the current nine Dietary Department employees had lost due to Plaintiff's time adjustments.  It then paid over $5,500 to those individuals to compensate them for pay they would have received had Plaintiff not made changes to their Kronos time records.  Even under the deferential summary judgment standard, the facts as presented indicate that the Hospital's reason for terminating Plaintiff's employment was not pretextual; rather, Plaintiff was terminated because Defendant believed that his actions were contrary to Hospital policy and applicable labor laws.  Based on the evidence

offered by Plaintiff in his Opposition regarding pretext, the Court cannot find Defendant's explanation for Plaintiff's termination to be unworthy of credence. *See Coghlan*, 413 F.3d at 1095.

Therefore, the Court grants Defendant's Motion as to Plaintiff's general discrimination claim under the ADA because Plaintiff failed to establish the existence of pretext. *See Celotex Corp.*, 477 U.S. at 322 (stating that summary judgment is appropriate when the nonmoving party does not establish an element necessary to the claim).

## 2. Retaliation under the ADA

In addition to Plaintiff's general ADA discrimination claim, the Complaint alleges that he was subject to adverse treatment in violation of the ADA's prohibition against retaliatory action. (Compl. 3) (citing both Sections 12112 and 12203 of the statute as the basis for his claim). Defendant argues that Plaintiff's failure to check the "Retaliation" box on the initial EEOC Charge of Discrimination form means that Plaintiff did not exhaust administrative remedies as to a retaliation claim. (Def.'s Reply to Pl.'s Opp'n 9, ECF No. 46).  Even if Plaintiff's Charge form did not include a checked "Retaliation" box, charges filed before the EEOC are construed liberally. *Josephs v. Pac. Bell*, 443 F.3d 1050, 1061 (9th Cir. 2005).  A court should look not just to a checked box, but also to allegations of discrimination "which can reasonably be expected to grow out of a charge of discrimination." *Id.* at 1062.  Plaintiff's Charge stated that he believed he was terminated because of his disability, (Charge of Discrimination 1), and Defendant was aware that Plaintiff had just recently returned from medical leave prior to his termination. (Miller Dep. 43:9–15).  The Court believes that Plaintiff's case, as presented, could reasonably include a retaliation claim.  Thus, the Court addresses the retaliation claim.

The *McDonnell Douglas* burden-shifting analysis is also the legal standard applied when considering an ADA retaliation claim on summary judgment. *See Brown*, 336 F.3d at 1186–87. Accordingly, Plaintiff's first burden is to make out a prima facie case by showing "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Id.* at 1187. The causal link prong is satisfied if a plaintiff shows that the adverse employment decision was "motivated, even in part, by animus based on a plaintiff's disability or request for an accommodation." *Head v. Glacier Nw. Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005). Plaintiff's argument focuses on establishing a causal link between his leave of absence for shoulder surgery and the date he was terminated. Plaintiff contends that the close proximity between his termination and his return from medical leave, along with his request to attend physical therapy, is circumstantial evidence sufficient to provide a causal link between the two. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 15). Plaintiff's latest surgery was in November 2011 and he was terminated in February 2012. (*Id.* at 16). Essentially, Plaintiff seeks to persuade the Court that the three month span between his return to work after shoulder surgery and his termination is sufficient inferential evidence to allow the retaliation issue to go to a jury notwithstanding Defendant's articulated reason for termination.

Plaintiff cites a number of cases supporting this argument. *See, e.g.*, *Dawson v. Entek*, 630 F.3d 928, 937 (9th Cir. 2011) (stating that temporal proximity can by itself constitute sufficient circumstantial evidence for purposes of both the prima facie case and pretext); *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 507 (9th Cir. 2000) (stating "that evidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant"); *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (stating that causation may be inferred from circumstantial evidence and the proximity

13

in time between the protected action and the employer's action). The Court's review of these cases showed that they were not analogous to Plaintiff's situation in any significant way. In the cases cited, there was no independent work-related complaint against the plaintiff in the time between when the plaintiff engaged in protected activity and when the plaintiff was terminated.

In Plaintiff's case, Sanchez complained about Plaintiff's time adjustments in February of 2012, after Plaintiff had already returned from medical leave. (Chaffin Decl. 4). Once the complaint was received, Trollope began the investigation that eventually led to Plaintiff's termination later that same month. The timing of Sanchez's complaint and the eventual termination leads the Court to believe that that any proximity between Plaintiff's medical leave and his termination is more coincidental than causal. Although the summary judgment standard requires the Court to make inferences in favor of the nonmoving party, it does not require the Court to ignore undisputed facts that undermine Plaintiff's argument. *See Anderson*, 477 U.S. at 250 (stating that the threshold inquiry on summary judgment is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may *reasonably* be resolved in favor of either party") (emphasis added). Plaintiff does not cite any additional facts to convince the Court that a jury could find that his medical leave and request to attend physical therapy were motivating factors in Defendant's choice to terminate him.

Therefore, the Court finds that Plaintiff fails to establish a causal link between his medical leave of absence and his termination. This deficiency means that Plaintiff has not established a prima facie case of retaliation, and the Court grants Defendant's Motion as to this claim. The Court notes, however, that even if it were to find that Plaintiff successfully demonstrated a prima facie case of retaliation, his claim would still not survive summary judgment. Plaintiff offers no additional proof that Defendant's articulated reason for termination

is pretextual under his retaliation claim.  The Court would thus find that the claim fails on this basis as well.

**B.  ADEA Claim**

The ADEA prohibits an employer from discharging an individual because of the individual's age. 29 U.S.C. § 623(a) (2012).  In evaluating an ADEA claim on summary judgment, courts in the Ninth Circuit again apply the *McDonnell Douglas* analysis. *Shelley v. Geren*, 666 F.3d 599, 607 (9th Cir. 2012). As noted above, this test shifts only the burden of production to the defendant once the plaintiff establishes a prima facie case; the burden of persuasion remains with the plaintiff. *Id.* at 607–08.  The employer's burden is to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* at 608.   Once the employer meets this burden, the plaintiff then is responsible for demonstrating a triable issue of material fact as to whether the articulated reason is pretext. *Id.* (citing *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010)).

A prima facie case under the ADEA requires Plaintiff to show that he was "(1) at least forty years old, (2) performing his job satisfactorily, (3) discharged, and (4) either replaced by substantially younger employees with equal or inferior qualifications or discharged under circumstances otherwise giving rise to an inference of age discrimination." *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207–08 (9th Cir. 2008).  It is undisputed that Plaintiff was over forty at the time of his termination and that his job performance up to that point was satisfactory.  It is also undisputed that after his termination, Plaintiff was replaced by Hornbarger who was significantly younger than Plaintiff and with less experience. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 7).  Plaintiff thus proves the prima facie case.

Defendant's articulated reason for terminating Plaintiff remains constant—that Plaintiff improperly adjusted employees' time records. Again finding this to be a legitimate, nondiscriminatory reason for termination, the Court moves on to the last stage of the *McDonnell Douglas* analysis, pretext. The standards used to measure a plaintiff's pretext arguments under the ADEA are identical to those utilized under the ADA. Namely, a court first considers the direct evidence offered by the plaintiff and then a court evaluates the circumstantial evidence. *Diaz*, 521 F.3d at 1212 (quoting *Snead*, 237 F.3d at 1093–94).

Consistent with the theme of his entire Opposition, Plaintiff's arguments supporting pretext under the ADEA are difficult to nail down. The Court understands these arguments to parallel Plaintiff's pretext arguments under the ADA claims. Besides Miller's vague statement that the Hospital did not want people like Plaintiff around, Plaintiff points to no direct evidence of age discrimination. The statement was made in the meeting when Miller terminated Plaintiff for make time record adjustments. Without additional context to show that the statement referred to people of Plaintiff's age, the Court is hard-pressed to believe that a jury could infer discriminatory meaning based on these words alone.

This leaves the Court to evaluate Plaintiff's circumstantial evidence. First, Plaintiff asserts that he was never confronted with specific edits that were allegedly improper and the edits he did make were in compliance with his understanding of Defendant's policies. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 17). Plaintiff points out that while other directors were simply instructed to not do any more edits, Plaintiff was terminated without being given the chance to likewise cease his adjustment of time records. (*Id.*). Defendant contends that Plaintiff was singled out and fired because his edits failed to correspond with a legitimate reason for adjusting an employee's punch and instead reduced the overall hours worked and the pay received. (Def.'s

Mot. for Summ. J. 9). Plaintiff does not offer any facts to rebut this claim or to demonstrate why Trollope's interpretation of Plaintiff's adjustments was incorrect, nor does Plaintiff challenge Trollope's investigatory methods.

Plaintiff contends that others in Plaintiff's age bracket were treated poorly as well. (Pl.'s Opp'n to Def.'s Mot. Summ. J. 17). As with his ADA claim, Plaintiff does not point to specific facts explaining how others were treated adversely because of their age or how those treated poorly were similarly situated with Plaintiff. *See Moran*, 447 F.3d at 755. As stated before, the nonmovant must point the court to specific facts and not sweeping conclusory allegations to defeat a summary judgment motion. *Cafasso*, 637 F.3d at 1061 (citations omitted). Since the Court cannot identify any other specific factual evidence in Plaintiff's Opposition that undermines the credence given to Defendant's nondiscriminatory reason for termination, Plaintiff fails to show pretext. *See Coghlan*, 413 F.3d at 1095. Accordingly, the Court grants Defendant's Motion as to the ADEA claim.

### C. Breach of Contract and Implied Covenant Claim

Under Nevada law, at-will employment is presumed and the employment relationship "can be terminated without liability by either the employer or the employee at any time and for any reason or no reason." *Martin v. Sears, Roebuck & Co.*, 899 P.2d 551, 553–55 (Nev. 1995). Moreover, "a claim arising from breach of contract has no application to at-will employment" and if a plaintiff fails to show that his employment was anything other than at-will, then "a breach of contract cause of action will not lie." *Id.* at 554. At-will employment likewise precludes an employee from claiming a violation of the implied covenant of good faith and fair dealing. *Id.* at 555 (stating that "breach of contract and bad faith discharge are not applicable to at-will employment").

An at-will relationship, however, can morph into a continued employment contract when the employer and employee expressly or impliedly agree that employment is to be for an indefinite term or that it may be terminated only for cause or "in accordance with established policies or procedures." *D'Angelo v. Gardner*, 819 P.2d 206, 211 (Nev. 1991).  Specifically, "an employer's issuance of an employee handbook containing termination provisions of which the employee is aware may support an inference that the handbook's termination provisions are part of the employment contract." *Minshew v. Donly*, 911 F. Supp. 2d 1043, 1058 (D. Nev. 2012) (Pro, J.) (citing *D'Angelo*, 819 P.2d at 209).  An employer can avoid creating an implied contract when using an employee handbook by including appropriately worded disclaimers in the handbook expressing that the policies contained therein do not affect the employer's right to discharge or terminate the employee at any time. *Sw. Gas Corp. v. Vargas*, 901 P.2d 693, 697 (Nev. 1995) (quoting *D'Angelo*, 819 P.2d at 209 n.4).  Consequently, if a plaintiff wishes to establish that her employment was not at-will by relying on the policies and procedures contained in an employee handbook, the plaintiff must demonstrate that the handbook proffers the policies and procedures without an effective disclaimer. *Id.*

In the present case, Plaintiff was sent an offer letter when the Hospital initially hired him over eleven years ago.  It stated that:

> This letter constitutes an offer of employment that is terminable at will by you or your employer at any time with or without cause.  Neither this letter or any other document, nor any of our previous or later conversations, are intended to be an employment contract expressed or implied, for any specific time period, and they should not be construed or relied upon as such.

(Offer Letter, ECF No. 34-1, Ex. 2.)  Plaintiff contends that his employment was not at-will, which would allow him to proceed with his breach of contract and breach of implied covenant claims.  He first argues that "[o]ne could construe the at will clause to refer to the offer of

18

1    employment, which became inoperable once the offer was accepted" and that "[a] reasonable

2    juror could construe the offer to be at will." (Pl.'s Opp'n to Def.'s Mot. Summ. J. 7–8).  This

3    argument fails as a matter of law because the Nevada Supreme Court has explicitly identified

4    this exact type of wording as "traditional at-will language designed to clearly inform a

5    prospective employee of his or her employment status." *Martin*, 899 P.2d at 554 (recognizing

6    that an employment application stating that the plaintiff's employment could be "terminated with

7    or without cause, and with or without notice, at any time, at the option of either the Company or

8    [the employee]" was traditional at-will language).  Plaintiff moreover did not believe he had an

9    express employment contract with the Hospital. (Norton Dep. 31:9–32:1).  So if Plaintiff's

10   breach of contract and implied covenant claims are to survive summary judgment, he must show

11   that the Hospital's employee handbook created an implied contract.

12          The mere existence of an employee handbook does not necessarily modify the at-will

13   relationship. *See D'Angelo*, 819 P.2d at 209 (discussing when an employee handbook *might*

14   modify an at-will arrangement).  However, Plaintiff points out that the Hospital's handbook

15   contained a progressive discipline policy, which he argues created a reasonable expectation of

16   specific procedures it would follow before terminating an employee. (Pl.'s Opp'n to Def.'s Mot.

17   Summ. J. 8–9).  Plaintiff directs the Court to two provisions of the handbook he believes is

18   supportive of this position. (*Id.* at 3, 8).  The first is a paragraph regarding "Corrective Action"

19   and states that "[t]he Hospital generally utilizes . . . levels of discipline" culminating in

20   termination. (Hospital Handbook 22, ECF No. 34-1 Ex. 3).  The second reads that "[w]here

21   practicable, employees that leave Northeastern Nevada Regional Hospital will have an

22   opportunity to participate in an exit interview process." (Hospital Handbook 33).

23

24

1    Defendant, however, identifies four specific instances where the handbook advises

2    employees that nothing contained therein should be construed as guaranteeing continued

3    employment or that termination might occur without progressive discipline. (Def.'s Reply 6–7).

4    For example, the handbook's introduction states that "[a]ny and all benefits, policies and

5    procedures set forth herein are statements of general policy and shall, in no manner, be construed

6    to imply a contract or guarantee for continued employment with the Hospital." (Hospital

7    Handbook 5).  Although it sets forth levels of discipline, "[t]he Hospital reserves the right to skip

8    any or all steps of this progressive discipline program and may terminate the Employee at any

9    time." (*Id.* at 22).  Notwithstanding these disclaimers, Plaintiff argues that the handbook's

10   language creates ambiguity that must be resolved by a trier of fact.

11   Plaintiff is correct that where there is "an element of relevant ambiguity" between the

12   disclaimers in an employee handbook and other provisions, it is generally considered a matter for

13   the jury to decide. *Sw. Gas Corp.*, 901 P.2d at 697–98.  "A handbook that contains both

14   promissory language and a disclaimer should be viewed as inherently ambiguous," requiring that

15   the entire handbook, including any disclaimers, be reviewed to determine whether it gives rise to

16   a promise. *Id.* (quoting *Fleming v. Borden, Inc.*, 450 S.E.2d 589, 596 (S.C. 1994)) (internal

17   quotations omitted).  Thus, "[t]he court should intervene to resolve the handbook issue as a

18   matter of law only if the handbook statements and the disclaimer, taken together, establish

19   beyond any doubt that an enforceable promise either does or does not exist." *Id.*

20   Upon review of the portions of the handbook highlighted by both parties, the Court finds

21   that Defendant's employee handbook does not give rise to an implied contract in this case.  The

22   provisions that Plaintiff cites in his Opposition do not rise to the level of a promise being made

23   by Defendant.  Both provisions Plaintiff identifies contains conditional language such as

24

"generally" and "where practicable."  The Corrective Action provision Plaintiff cites is immediately followed by the disclaimer that the Hospital may bypass the steps listed and go directly to termination.  The "Exit Interview" provision simply recites the purpose for an exit interview, indicating that where practicable the employee will have an opportunity to participate in the exit interview process. (Hospital Handbook 34)  Even a deferential reading of that provision does not support Plaintiff's assertion that it gives rise to a reasonable expectation that termination cannot properly occur without an exit interview.  Instead, the plain meaning of the words simply indicates that when it is practical for the Hospital to do so, it conducts exit interviews "to ensure retention of resources and system security."  The provision as a whole seems designed to benefit the Hospital in its future practices rather than to protect any right of the exiting employee.

When reviewing the progressive disciplinary provisions of the handbook next to the applicable disclaimers, the Court fails to see the ambiguity asserted by Plaintiff.  Based on the facts provided by the parties, the Court determines that a reasonable juror could not find an implied contractual relationship between Plaintiff and Defendant.  Accordingly, as a matter of law, Defendant's Motion relating to Plaintiff's claims for breach of contract and breach of the implied covenant of good faith and fair dealing is granted. *See Martin*, 899 P.2d at 554–55.

///

///

///

///

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (ECF No. 34) is GRANTED.

IT IS SO ORDERED.

Dated: September 16, 2014.

_____

ROBERT C. JONES

United States District Judge